Brian Dauscher, Appellant, Silverado & Procurement We'd like to reserve two minutes for rebuttal. Given the limited time, I'd like to focus the Court's attention immediately on the Alena case. In 2019, four years into this litigation involving hundreds of hospices, of which this is one lead case, the Supreme Court in a 7-1 decision, where Kavanaugh sat out because he had reached the same decision below, vacated an HHS rule that had been promulgated on its website, modifying a reimbursement calculation retrospectively. It did so in spite of numerous objections by HHS that this was the fair rule to reach. It noted that HHS had promulgated the same rule by notice and comment for prospective change, and that was not challenged. But what was challenged was the retrospective change in violation of 1395HH. And in a 7-1 decision, Judge Gorsuch, Justice Gorsuch concluded that that was unlawful and that the specific notice and comment statute that Congress had imposed on Medicare. It's very interesting to note that the APA did not impose notice and comment generally under the two Medicare. Medicare went along with that on its own for a while and then stopped. Then Congress stepped in and said, no, you're going to do that. And not only are you going to do that, you're going to give more time than you give generally under the APA. You're going to give 60 days, not 30. And not only that, but any substantive legal standard is going to be subject to this notice and comment rule, which is a broader standard, as the Supreme Court found, than the standard that is generally applied under the APA. Why isn't this then not governed by this court's decision in agendia on this point? Agendia involved the question of whether a local coverage determination needed to be promulgated by notice and comment rulemaking. And I think in that case, the Ninth Circuit properly found that the LCDs, local coverage determinations, are non-binding. They do not bind contractors or Medicare to any result. And in that case, it's just guidance. And so it's not a substantive legal standard. That's an understandable decision, as is the Clarion decision, which is similar. Non-binding guidance on whether Medicare contractors... Oh, counsel. Counsel, we've just lost you. Hold on. Did you... It looks like you muted yourself or something on our end. Are you hearing me now? Now I can hear you. Yep. I think maybe you hit a button accidentally. If you just back up about 15 seconds, we'll be with you. So did you hear my explanation of agendia and then into Clarion? Yep. So Clarion is a similar case, right? It's non-binding guidance on when Medicare contractors should engage in reconciliation. And in that case, the court refused to vacate reconciliation done under that guidance because CMS reserved the right to make the final decision about whether reconciliation would occur. But this case is very much like Alena in that we are talking about a substantive change to the cap calculation. There's really no doubt about that. In fact, if you look at both of them... Right, but one that's required by statute. So I'm not sure why... Well... I guess I'm somewhat surprised this is where you began your argument because this is the end of your brief, but this is just a procedural point. But the statute talks about how to... You know, it has to be a 2%. I mean, that's not coming from HHS here. Well, again, what the statute says, 906D, which in seven paragraphs details Congress' instructions about how to implement sequestration, is to say that individual payments to providers under Part A, which hospices are part of, are to be reduced by 2%. Every single individual payment to a hospice is, in fact, reduced by 2%. What we have here, though, the Budget Control Act does not actually dictate that the cap calculation be modified. We do not see that language in the Budget Control Act. Instead, what we see is both the board and HHS in its findings. The board said, the Provider Reimbursement Review Board, conceded that what HHS had done was to reverse engineer a reduction in the cap. And in their brief to this court, HHS says, though the statute may not permit the agency to alter the calculation of aggregate cap directly, the Budget Control Act required the agency to approximate the effect of lowering the aggregate cap. So they are doing indirectly that which is prohibited directly by the cap statute. Right, but they're not changing the cap calculation. This is an interpretation of the phrase, the amount of payment made. And you have one view of what that means, but I'm not sure it's... Both the board and HHS concede that what's really going on, it would have been far simpler simply to reduce the cap allowance by 2% instead of this Rube Goldbergian calculation to steer clear of the iceberg of the statutory instructions about the cap. And they chose not to do that. And I would submit that if the Budget Control Act, in fact, requires this, then HHS should have simply reduced the cap. How do we say that they can do indirectly that which they themselves concede in this brief before the board everywhere else? They cannot do directly. They should have just done directly. If what you're saying is right, the Budget Control Act made them do it in this case, right, then they should have done it directly. And they didn't do that. Instead, they issued a technical direction letter, which on its merits is less useful than a public website posting as in Alena. It's a confidential notice that basically says, we're going to do this because we really like to make this a retroactive rule. We don't think Congress will do that for us. I mean, keep in mind that the Budget Control Act was passed three and one half years before the technical direction letter came out. Sequestration was imposed by presidential order two years before the TDL came out. In the fall of 2014, three months before the TDL came out, when Medicare was hinting at an open door forum that it was thinking about this, it was also before Congress obtaining changes to the cap statute itself. Now, if it thought that Congress was going to go right along with this idea that the cap allowance should be reduced by 2% in any year in which sequestration had that effect, why didn't it just ask Congress to do that? As we said in our brief, sometimes saying that you should ask Congress is a little unfair to the government. I don't think it's unfair in this context, honestly, at all to suggest that. I think that's exactly what they should have done. And I'd submit that one reason probably why they didn't do it is they didn't want to have a discussion with hospices before Congress about the merits and impact of this cap. One thing that's been said in numerous courts and before the board and by the government is that cap hospices are bad. We use different words to say this. Sometimes they're called inefficient. Sometimes there's even darker things attributed to them for running over the cap. And I hope that you understand that the cap is an objective blunt instrument that takes money back from hospices without any subjective analysis of fault. In particular, for hospices in California, as we pointed out at page 33 of our brief at note 7, because reimbursement for hospices is primarily composed of services and a little component of goods like drugs and durable medical equipment, hospices in California have to get a much higher daily reimbursement than hospices in lower wage index areas. Hospices in California will, on average, hit the cap on about half the days of average service to a patient's population than a hospice in Puerto Rico. These may be valid points, but I don't know. I'm not sure what we can do about that. That seems like something you would raise to the agency or to Congress. I 100% agree with you, Your Honor, 100%. Courts aren't free to rewrite clear statutes under the banner of our own policy concerns. This is what Justice Gorsuch said, we know, when the government said, but this calculation that we want to do, it's really the right calculation. It's the right way to do this. He said, you're not free to do that. This should be world. And see, the government has to live in a should be world here. They have to say, this is the right thing to do. Well, I'd submit that having represented hospices for 15 years, I could go on for three hours before you about just how unfair the cap is. Hospices can admit patients who have had a lot of prior service because another hospice goes out of business in its area. That immediately throws them into cap liability. And there's no application of the government saying, hey, hey, wait, you know, I know the cap is out there, but you really shouldn't apply it to me. All I did was admit patients who've been discharged from one of those other hospices, the one we don't like. There's no such thing. This is a blunt, gross, objective instrument. The case is not a challenge to the cap. I mean, I don't know. And so I just don't – I'm not sure what to make of this point. I mean, you seem to be asking us to now vacate the rule for lack of notice and comment. We know what the government's position would be on this because they've now been litigating this issue for years. But I guess you and your clients would go and try to get the government to adopt a new rule, which you can already do. But is that the relief you're asking for here, to just vacate this on procedural grounds now? I mean, that is certainly part of the relief we're seeking. I think it should be vacated on the merits. I think when Congress says that the amount of payment made is due to be compared to the cap allowance, that that cannot include in a society that has any self-respect an amount of payment that was not made. We gave the example, as it relates to this wage index difference, that in theory Medicare could have solved that unfairness by instead of attributing to hospice what was actually paid in California, they could have just taken an average amount of reimbursement and attributed that, thereby grossing up providers in lower wage index areas on their revenue and grossing down providers in California, and thereby essentially fairly ensuring that providers in each jurisdiction would have a fair, the same amount of right to serve a patient for a number of days. There's no reason on God's green earth why a patient, a citizen living in California, should effectively have less access to hospice than a patient living in a low wage index. But what HHS said when confronted with that argument was, hey, our hands are tied. We understand your concern. It's not fair. We can't do anything about it. What we're here saying today is goose and gander, okay? It cannot be the case in a free society that the government is fair to hold up that defense when it suits them, but then say, oh, we have to do this because it's fair. The Budget Control Act made us do this, et cetera. The Budget Control Act, again, does not make HHS do this. It is fully vindicated at the time each individual payment is made. And we know that in hospice, unlike in hospital service, all the money a hospice, like our two clients, will ever get comes after that month of service when it submits a claim. The only thing that can happen after that is that money can get taken back. And it can get taken back in lots of creative and different ways, including this cap, other caps, postpayment audits and fines, penalties, all kinds of things can come in after the fact to take it back. But we know that Congress's intent, Congress decided at what point should we collect the money to be sure that our intent of paying 2% less on every dollar that goes out of Medicare is met. And the best way to do that is to do that when the money is paid out. The government has to create a fiction in this case that these payments are, quote, interim payments. They really are not. There is no statutory history showing that hospice payments are interim in any way, shape, or form. The cost report that hospices submit doesn't have any effect on that hospice's reimbursement. It's a data collection item for hospice, unlike hospitals where they get payment adjustments based on that. So we'd submit that in fairness to protect the goodwill of the United States, we have to be able to say that we as lawyers do know what amount of payment made means. We see it in the regulation. We see it in the policy. And this is not it. We have reserved time. Thank you. You're welcome. We'll hear from opposing counsel. Good morning, Your Honors, and may it please the Court, McKay Newmeister on behalf of the government. I'd like to start by taking a step back and focusing on what this case is about. The plain text of the Budget Control Act required a 2% reduction in Medicare spending, which can only be achieved for hospice payments if applied after the aggregate count, which is precisely what CMS did here. Plaintiff's view of the statute, by contrast, would exempt them from the effects of sequestration entirely. Their approach would thus produce an incongruous result, such that hospices that have reimbursement below the aggregate count are hit with the full effects of sequestration, whereby hospices that exceed the count are not. This creates a perverse incentive for hospices to structure their behavior, to increase claims in order to exceed the count, in order to retain a greater reimbursement from Medicare and thus avoid the full effects of sequestration. If that is indeed the statute that Congress enacted, that would be very surprising. Rather than reducing Medicare spending for hospice care by 2% across the board, for a significant percentage of hospices, there would be no reduction in spending at all, and hospices would face upward pressure to increase their claims in order to avoid that reduction. But that's not the statute that Congress enacted. And as the district court correctly held, CMS did exactly what Congress required, pursuant to both the Medicare Act and the Budget Control Act. Accordingly, this court should affirm. My welcome. Your opposing counsel sort of began with the procedural, the ALENA issue, so why don't you address that? Yes, Your Honor. So CMS was acting pursuant to the mandatory statutory directive of the Budget Control Act here, and so that's enough to resolve that procedural question. The procedural requirements in 1395 H.H.A. 2 simply don't apply where any change is coming from a separate statutory directive. If you look at the text of H.H.A. 2, it only applies where the agency establishes a substantive legal standard governing payment for services under Medicare. This is not the agency exercising any direction to change anything about payments under Medicare. This is just the implementation of an external directive from a separate statute, Your Honor. Could the agency have done notice and comment? I presume yes. I'm not certain if there are any limits on the agency going above and beyond what's required by the statute, Your Honor. It's possible the agency could have done something that wasn't required here, but it simply didn't need to under H.H.A. 2 because it was implementing this clear directive from the Budget Control Act. It seems, I mean, the rollout seems a little bumpy. You know, HHS figured out its position, but initially it did seem a little unclear what that position was going to be. Yes, so to speak to the timing, Your Honor, I think it's helpful to take a look at when this happened in relation to when the caps were normally applied. So before fiscal year 2014, the caps were applied by the MAC in the first instance. As we explained in our brief, that was normally done approximately 16 to 24 months after the end of the cap period, which is right around the time that the TDL was issued here. The agency was in the process of figuring this out. As my friend on the other side mentioned, there was an open-door forum in November 2014 where this was discussed, and ultimately the agency determined what would happen with respect to sequestration and the cap and issued that TDL right around the point in time when the MACs were beginning to need to be making this determination and applying the caps for the fiscal year 2015. Your opposing counsel says this is sort of doing indirectly, changing the cap calculation, something you can't do but you're doing indirectly. Can you comment on that? Yes, Your Honor. So because the agency is acting pursuant to this mandatory directive from a separate statute, there's nothing in the Medicare statute that can prevent the agency from following that directive. Ultimately what the agency did here is it implemented sequestration in a way that would achieve the result that was required under the Budget Control Act, but also in a way that did not interfere with the normal rules under the Medicare program. Payments are calculated under the normal Medicare rules. The cap is applied to the total amount of reimbursement that a provider is due for the year as calculated under Medicare, and as the PARB recognized, sequestration is then effectively applied after the fact so that it's applied separately and doesn't affect this normal process. That was consistent with the statute and ultimately the agency had to be implementing sequestration in this way in order to give full effect to the requirements of the Budget Control Act. You read amount of payment made to basically mean the amount of payment to which you're legally entitled, which here would include the 2% reduction. So, Your Honor, amount of payment made in 1395FI2A, as the district court explained, it's referring to, that's correct, Your Honor, well, it's referring to the total amount of program reimbursement of allowable payment that a provider is entitled to receive for the year under Medicare after factoring in the limitation of the aggregate cap. And so it's simply asserting the principle that at the end of the day, what a provider can be paid, what it's allowed to keep cannot be any greater than the aggregate cap. And so there's nothing about the way that the agency has implemented sequestration here that conflicts with that general principle. Well, it is true that that in effect reduces the aggregate cap by 2%. You're just saying that's not improper. Am I correct? You're correct, Your Honor, that as a practical matter, for a hospice that has exceeded its aggregate cap, what happens then is the aggregate cap becomes the total amount of allowable payment that the hospice can receive for that year. And sequestration has to be applied to that amount. And so what happens is the hospice's payment has to be reduced to the aggregate cap, and then the government has to make sure that it has sequestered 2% of that. So the hospice is ultimately left with 2% less than its cap. I mean, any change that Congress imposes that reduces hospice payments could also be recharacterized and say, well, you could achieve the same amount, that same lower amount, by adjusting the cap and the cap formula. And so I don't – this is not really a question. It's more I suppose I'm agreeing with what you're saying, that I don't think this really proves anything to say that it reaches the same results that a alteration to the cap formula would also reach. You can't change the cap formula, but I didn't think you had done so here. We agree with that, Your Honor. The agency has implemented sequestration in a way, as the PRRB said, so that the cap is not being changed at all. Sequestration is effectively implemented at the end, and it's implemented in the way that the Budget Control Act requires, such that overall there is a 2% reduction in the Medicare program. There's a 2% reduction for hospice payments overall within that program, and it serves the ultimate statutory goal of sequestration, which is to achieve a certain level of deficit reduction. The agency is simply acting consistent with the statutory requirements here without doing anything to violate any requirements in the Medicare statute. I don't know if you're working on other litigation on this question, but we know about the DDC and the D.C. Circuit case. Are there any other cases pending out there? So, Your Honor, I know that there is the one case currently pending in the D.C. Circuit. I believe there is a second case pending in D.D.C. that's currently on hold for the D.C. Circuit case, so those are two cases in the courts. I'm not aware of any other cases specifically pending in the courts of appeals, but the last time we looked at the information before the PRRB, there were 45 pending group cases that had anywhere between two and eight providers associated with them and an additional 20 individual appeals. So, as far as I'm aware, that's the scope of the nature of the challenges to this issue. Anything further? No. It doesn't seem that there are further questions. Thank you very much for your argument. We'll hear from opposing counsel. Thank you, Your Honor. Thank you, Your Honors. Let me just address this question of timing of the TDL. The record shows at 182, 451, and 1194 that in the summer of 2014, MACS had already begun calculating the 2013 cap, which included, in theory, the sequestration issue. They had issued demands without including sequestration. The record further shows that CMS recalled those calculations, so we see the MACS acting in a natural way, applying what was then 30-year-old precedent, which remains unchanged today in both the regulation and in policy manuals, that payments made that exceed cap are overpayments and must be refunded. And in the policy manual, it twice says total actual Medicare payments made are to be compared to the cap. They haven't even bothered to change that language in the six years since this litigation began, but yet they urge before the board and these courts a different interpretation of amount of payment made than they themselves have been using in practice for 30 years. When they say that when the government concedes that they can't make a change to the cap, they're conceding everything in that. They cannot do indirectly that which they cannot do directly. If the BCA mandates that change, they should have just reduced the cap. It certainly makes it no better to do indirectly that which they are precluded from doing directly. Our clients have just been in wonderment about this amount of payment made. They've understood what this means. The government should not be permitted to redefine that term when it suits them and to refuse to redefine that term when fair policy would require a different result. And we appreciate your consideration of this case. No further questions? No, looks like not. Thank you very much for your arguments, both of you. Very helpful arguments and for your briefing. Take that case under advisement.
judges: CHRISTEN, BRESS, Lynn